O.K., et al., Petitioners,

v.

George W. BUSH, et al., Respondents.

No. CIV.A.04–CV–01136(JDB).

United States District Court,
District of Columbia.

Oct. 26, 2004.

Mainer I. Ahmad, Richard J. Wilson, American University Washington College of Law, Washington, DC, for O.K.

Eric M. Freedman, New York City, for Fatmah Elsamnah.

Robert J. Katerberg, Terry Marcus Henry, Vincent M. Garvey, Joseph H. Hunt, Preeya M. Noronha, Lisa Ann Olson, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Donald Rumsfeld.

## *MEMORANDUM OPINION*

BATES, District Judge.

Petitioner O.K. is an eighteen-year old Canadian citizen who has been held by the United States since the age of fifteen in a detention facility at the United States Naval Base in Guantánamo Bay, Cuba.[1] His grandmother has filed a petition for a writ of habeas corpus on his behalf as his next friend challenging the fact of his confinement and the conditions in which he is detained. On September 21, 2004, pursuant to a Resolution of the Executive Session of this Court, the case was transferred to Senior Judge Joyce Hens Green for coordination and management with the other habeas petitions filed in this Court by more than 60 detainees at Guantánamo. The case was retained by this Court for all other purposes.

Presently before this Court is petitioners' emergency motion to compel the government to allow an independent medical evaluation and to produce the medical records of petitioner. Petitioners argue that he is in poor and deteriorating physical and mental health, and that the Court has the authority to issue an order under its inherent authority or the All Writs Act, 28 U.S.C. § 1651(a), to ensure that petitioner understands any charges that are filed against him and can participate meaningfully in his defense. The United States counters that the relief sought by petition-

ers would trespass on the separation of powers; that the Court lacks authority to issue such an order under the All Writs Act because an independent medical review or the production of medical information is not necessary to preserve the Court's jurisdiction; that the order is an inappropriate exercise of any authority the Court might be viewed to possess because no charges have been brought against petitioner, and accordingly there is no reason to undertake any inquiry into petitioner's mental competence; and that, in any event, petitioner has failed to establish that his medical or mental condition requires an independent medical evaluation.

For the reasons set out in this memorandum opinion, the Court finds no basis for the emergency relief sought by petitioners at this time. In arriving at this conclusion, the scope of analysis is limited. The Court does not find it necessary to address the bounds of its authority under the All Writs Act (or any other constitutional or statutory source), or the extent to which that authority may be cabined in the circumstances of this case by the separation of powers. In addition, petitioner is no longer a minor, and the relief sought by this motion is prospective, and therefore the Court need not decide at this time the extent to which, if at all, a detainee's status as a minor alters the rights of the detainee or the responsibilities of the United States in administering his detention. Finally, and most importantly, the Court does not directly address the merits of the challenges to the legality of petitioner's detention or the conditions of his confinement.

Instead, the Court's ruling is narrow, and pertains solely to the emergency request for an independent medical evalua-

---

**1.** Although petitioner is no longer a minor, he was one when he filed his petition for a writ of habeas corpus, and the Court will accordingly refer to him by his initials, consistent

with the Local Rules of this Court. *See* L. Civ. R. 5.4(f)(2); First Amended Petition for Writ of Habeas Corpus ("Petition") ¶ 13.

tion and the release of medical records. As to that request, the Court concludes that petitioners have identified no legal proceeding for which there is a legal right to a determination of mental competency at this time. Even if there were such a proceeding, moreover, the Court concludes that petitioners have failed to produce evidence that calls into question petitioner's mental competency such that the relief sought would be appropriate. Finally, the Court rejects petitioners' request, untethered to any substantive claim of a violation of legal rights, that the Court should intercede in the decision-making of medical personnel at Guantánamo.

Accordingly, petitioners' emergency motion to compel the government to allow an independent medical evaluation and to produce medical records is denied.

## BACKGROUND

### A. Factual Background

On September 11, 2001, the al Qaeda terrorist network used hijacked commercial airplanes to launch a vicious and coordinated attack on the United States. Approximately 3,000 people were killed in the terrorist attack. One week later, the Congress passed a resolution authorizing the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks." Authorization for Use of Military Force, Pub.L. 107–40, § 2, 115 Stat. 224. Pursuant to that authority, the President ordered United States Armed Forces to Afghanistan with the mission of subduing the al Qaeda network and the Taliban

regime that supported it. In the course of that campaign, the United States and its allies captured a large number of individuals, many of them foreign nationals, and transported many to the United States Naval Base at Guantánamo Bay, Cuba ("Guantánamo") for detention. There are presently more than 500 alien detainees being held at Guantánamo. *See* Decl. of Dr. John S. Edmondson ("Edmondson Decl.") ¶ 1.

One of those detainees is the petitioner in this case, a now eighteen-year old citizen of Canada. In the wake of the Supreme Court's ruling in *Rasul v. Bush,* — U.S. ——, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), he filed a petition for a writ of habeas corpus on his own behalf and through his grandmother as his "next friend" (collectively, petitioner and his grandmother are referred to herein as "petitioners").[2] The petition challenges the legality of petitioner's detention and the conditions of his confinement under the Constitution, several federal statutes and regulations, and international law.

Shortly after filing the habeas petition, petitioners filed an emergency motion asking this Court to instruct respondents[3] to allow an independent medical evaluation of petitioner at Guantánamo and to release his full medical records. The thrust of petitioners' argument as it has evolved is that this Court has an obligation to ensure petitioner's mental competency so that he can understand and participate in the defense of any charges that might be brought against him by military authorities. The motion also hints, at times, at a

---

**2.** The petition was later amended to clarify that it was being filed exclusively through his grandmother as his next friend, because petitioner "cannot secure access either to legal counsel or to the courts of the United States." Petition ¶ 4.

**3.** The respondents are listed as President George W. Bush, Secretary of Defense Donald Rumsfeld, Army Brigadier General Jay Hood, and Army Colonel Nelson J. Cannon, all sued in their official and individual capacities.

broader argument that the Court bears a more general duty to monitor the health and physical well-being of detainees at Guantánamo.

Attached to the motion is a series of newspaper articles and website print-outs that generally address the conditions at Guantánamo, but do not specifically discuss petitioner's situation (except for a single article that mentions his confinement but does not discuss his health or living conditions). Somewhat more helpful is an affidavit submitted by petitioner's grandmother that is attached as an exhibit to the habeas petition. From this affidavit, as well as several submissions by respondents, the Court can piece together the circumstances of petitioner's capture and his detention that are relevant to this emergency motion.

Petitioner is a Canadian citizen born in Ottawa on September 19, 1986. *See* Petition ¶¶ 3, 13; Aff. of Fatmah Elsamnah ("Elsamnah Aff.") ¶ 11. After living in Canada and Pakistan for portions of his childhood, he moved with his family to Kabul, Afghanistan in 1997. *See* Petition ¶ 13; Elsamnah Aff. ¶¶ 15–32. In July of 2002, petitioner was captured during a battle with American forces in Kabul. *See* Petition ¶ 13; Elsamnah Aff. ¶ 47. At least one American soldier died in the battle.[4] *See* Elsamnah Aff. ¶ 46; Return at 11. At the time of his capture, petitioner was fifteen years of age and seriously injured, with shrapnel wounds to several parts of his body, including one to his left eye that has led to the loss of much of his vision in the eye. *See* Elsamnah Aff. ¶ 46;

Petitioner was transported to Guantánamo in the late fall of 2002. *See* Petition ¶ 13; Letter from Dep. Ass't Att'y Gen.

Thomas Lee to Senior Judge Joyce Hens Green, Sept. 3, 2004, at 2 n. 1 ("Sept. 3 Lee Letter"); Resp'ts' Resp. Emergency Mot. Compel ("Resp."), Ex. A (Healthcare Services Evaluation). He was sixteen years old when he arrived at Guantánamo. *See* Sept. 3 Lee Letter at 2 n. 1. The petition for a writ of habeas corpus represents that petitioner has since been held "virtually *incommunicado*" at Guantánamo, "separated from his mother and other family members, and without access to counsel." Pet'rs' Memo. Supp. Emergency Mot. ("Pet.Mem.") at 4. He is now eighteen years of age, and is still detained at Guantánamo at this time.

Petitioner has been housed in general population since he arrived at Guantánamo. *See* Sept. 3 Lee Letter at 2 n. 1; Elsamnah Aff. ¶ 49. According to newspaper accounts, each detainee in general population lives in a separate cell that is 6 feet 8 inches by 8 feet and, as a general rule, is allowed out of the cell three times a week for 20 minutes of solitary exercise, followed by a 5–minute shower. *See* Pet. Mem., Ex. C (Ted Conover, *In the Land of Guantanamo*, N.Y. Times Magazine, June 29, 2003 ("New York Times Article")) at 3. There is a separate detention facility at Guantánamo called Camp Iguana, reserved for detainees under the age of sixteen, that is modified to meet the needs of juveniles. *See* Sept. 3 Lee Letter at 1. Detainees at Camp Iguana participate in group counseling and meet with specialists to address their behavioral and educational needs. They are also provided with an opportunity to learn mathematics and improve their literacy, as well as participate in physical exercise. *See id.* at 1–2; New York Times Article at 1–2. Petitioner has never been

---

4. In fact, respondents state that petitioner has "admitted he threw a grenade which killed a U.S. soldier during the battle in which the detainee was captured." Resp. Factual Return ("Return") at 11.

housed at Camp Iguana. The respondents explain that this is because he did not arrive at Guantánamo until after his sixteenth birthday. *See* Sept. 3 Lee Letter at 2 n. 1.[5]

According to a declaration submitted by Dr. John S. Edmondson, a Captain in the United States Navy who oversees the hospital that provides medical care to the detainees at Guantánamo, all detainees arriving at Guantánamo are given a complete physical examination upon arrival, and continue to receive medical attention throughout their detention. *See* Edmondson Decl. ¶¶ 5–6. A detainee can obtain medical care at any time by making a request to a guard or to medical personnel who make rounds on the cellblocks every other day. *See id.* ¶ 5. From January 2002 to December 2003, the hospital staff conducted over 30,000 outpatient visits. *See id.*

The detention hospital has eighteen beds and a medical staff of seventy, as well as a twenty-one member behavioral health services staff. *See id.* ¶¶ 3–4. For medical procedures beyond the means of the detention hospital, Dr. Edmondson says that detainees are transferred to the Naval Base Hospital at Guantánamo, and specialists are occasionally flown in to provide care to detainees when the care even at the Naval Base Hospital is insufficient. *See id.* ¶ 6. Dr. Edmondson reports that detainees at Guantánamo have been treated for a variety of medical conditions,

among them hepatitis, diabetes, tuberculosis, malaria, and malnutrition. *See id.* ¶ 7. The medical staff has provided prescription drugs as well as prescription eyeglasses and prosthetic limbs. *See id.* ¶ 7. Since January 2002, the staff has performed over 160 surgical procedures on detainees, ranging from the removal of an appendix to coronary artery stent replacement. *See id.* ¶ 9.

Finally, in a portion of the declaration filed under seal for reasons of privacy,[6] Dr. Edmondson states that he has reviewed the medical records of petitioner, and concludes that _____. *See id.* ¶ 10. Dr. Edmondson states that petitioner "has a history of _____." Dr. Edmondson also emphasizes that at "no time was [petitioner] denied medical care as a consequence of not cooperating in interrogations." *Id.* Along with Dr. Edmondson's declaration, the respondents submitted under seal a "Healthcare Services Evaluation" that summarizes the treatment of petitioner for his battle wounds and several minor medical problems, and concludes that he has _____. Healthcare Services Evaluation at 1–2. The Healthcare Services Evaluation notes that petitioner "has been followed by Behavioral Health Services for a diagnosis" of _____ but is "currently not being followed by BHS." *Id.* at 2.

Petitioners do not submit any evidence specifically refuting Dr. Edmondson's account of the medical facilities at Guantánamo.[7] Nevertheless, they express concern

---

5. The respondents state that there were only three detainees known to be younger than sixteen who were detained at Guantánamo, although they were all released to their home countries in January 2004. *See id.* at 1. As of September 3, 2004, there were only two detainees other than petitioner who were believed to be older than sixteen but younger than eighteen. *See id.* at 2 n. 1. Petitioner is now eighteen years old.

6. Consistent with those personal privacy concerns of petitioner, references to petitioner's specific medical or mental history, treatment and assessment as drawn from respondents' submission have been redacted from this opinion.

7. In fact, the newspaper articles submitted by petitioners tend to confirm Dr. Edmondson's account. *See, e.g.,* Pet. Mem., Ex. F at 1 (Charlie Savage, *Guantanamo's "Child Soldiers" in Limbo,* November 16, 2003, at 2)

about the actual nature of the medical care that has been given to petitioner and his current physical and mental condition. Petitioner's grandmother states in an affidavit that petitioner's older brother Abdurahman, who was detained in Guantánamo for several months, was able to talk to petitioner:

> I am advised that Abdurahman never saw [petitioner]. However, they did speak one time through a fence. [Petitioner] expressed concerns over his health and the fact that, without medical attention, he would completely lose the sight in his left eye.

Elsamnah Aff. ¶¶ 33–36, 46, 48. The affidavit does not explain how petitioner's grandmother came to be aware of this conversation, and it does not provide any more information about petitioner's concerns. Petitioners allege that petitioner's grandmother has "received several messages from petitioner expressing concern over his detention," although neither the messages, nor any description of the messages, is in the record. *See* Petition ¶ 4.

Beyond these statements, petitioners rely on three kinds of information in support of their emergency motion. First, they direct the Court to newspaper articles and reports from international organizations expressing concern about the rising number of suicide attempts by detainees and, more generally, the allegedly deteriorating state of the mental health of many of the detainees in the face of indefinite confinement and extended isolation. *See* Pet. Mem. at 4–6. The articles submitted by petitioners also include some accounts by ex-detainees of the use of torture in the interrogation of detainees at Guantánamo, and reports that the Defense Department has authorized the use of attack dogs and

"stress and duress" techniques in the interrogation of detainees. None of these accounts discuss petitioner or his physical or mental condition. Petitioners do not submit as evidence sworn affidavits from any the ex-detainees.

Second, petitioner submits two declarations of Dr. Eric Trupin, a professor of psychiatry and behavioral sciences at the University of Washington School of Medicine. In the first, Dr. Trupin concludes on the basis of what is known about petitioner's age, background and conditions of his confinement that his detention at Guantánamo places him "at significant risk for future psychiatric deterioration." Pet. Mem., Ex. E (Aug. 5, 2004, Decl. of Eric W. Trupin, Ph.D. ("Trupin Decl.")) ¶ 17. Dr. Trupin notes that he has not been allowed to meet or talk with petitioner, and therefore acknowledges that he cannot base his conclusions on a personal examination of petitioner. *Id.* ¶ 21. In the second declaration, Dr. Trupin states that the Edmondson Declaration and the Healthcare Services Evaluation filed by respondents do "not meet minimal standards in addressing" petitioner's psychological health, and "[n]ever in my thirty years of clinical experience have I encountered an adolescent who has sustained this level of injury and changes in the circumstances of his functioning who has not displayed more serious forms of psychiatric and cognitive impairments." Pet. Reply Mem. Supp. Emergency Relief ("Pet. Reply Mem."), Ex. A (Aug. 23, 2004 Decl. of Eric W. Trupin, Ph.D. ("Trupin Reply Decl.")) ¶¶ 5, 9.

Finally, petitioners cite to a website containing a report written by three British citizens who were released from Guantána-

("At an on-site hospital, doctors give the detainees regular health and dental checkups."); New York Times Article at 3 ("The average

prisoner, I am told, has gained 13 pounds since arriving at Guantanamo.").

mo in March 2004. Pet. Mem. at 4–5 (citing http:// www.ccrny.org/v2/reports/report.asp?ObjID=4bUT8M231k & Content=424 ("Report of British Detainees")). The report alleges a range of abuses at Guantánamo, and describes the treatment of certain detainees in particular, including petitioner. The authors claim that in the time that they were at Guantánamo, petitioner was in constant pain, and yet doctors denied him medical care on numerous occasions because he had refused to cooperate with interrogators. They relate one instance where petitioner was allegedly on the floor in isolation badly ill. When the guards called the medics, "they said they couldn't see [petitioner] because the interrogators had refused to let them." Report of British Detainees ¶ 298. The authors of the report do not swear to the truth of the allegations contained therein, and neither the report nor any other materials from these individuals has been submitted as evidence in this case.

On September 7, 2004, a military Combatant Status Review Tribunal ("CSRT") concluded that petitioner is "properly classified as an enemy combatant and is a member of, or affiliated with al-Qaida." [8] Return at 7–8. The documents filed by respondents in this Court regarding the CSRT proceedings state that the CSRT unanimously determined that petitioner "was medically and physically capable of participating in the proceeding" and "un-

derstood the tribunal proceeding." [9] *Id.* at 7–9. On September 10, 2004, the Legal Advisor to the CSRTs concluded that the proceedings and decision of the Tribunal were "legally sufficient and no corrective action is required" and recommended "that the decision of the Tribunal be approved and the case be considered final." *Id.* at 2–3.

## B. Procedural History

Petitioner filed a petition for a writ of habeas corpus on July 2, 2004. He then filed this emergency motion on August 10, 2004, and an amended petition for a writ of habeas corpus on August 17, 2004.[10] Respondents filed their response to the emergency motion on August 18, 2004, to which they attached the affidavit of Dr. Edmondson and the Healthcare Services Evaluation discussed above. On September 1, 2004, and again in a clarifying order on September 14, 2004, this Court required respondents to provide a factual basis for petitioner's detention. On September 15, 2004, respondents submitted materials pertaining to petitioner's CSRT proceedings, some of which are summarized above.

That same day, the Executive Session of this Court issued a Resolution observing that "a significant number of cases pertaining to more than 60 individual detain-

---

**8.** Among the documents from the CSRT proceedings is a "Summary of Evidence" stating that "the United States Government had previously determined that the detainee is an enemy combatant" on the basis of "information possessed by the United States that indicates that he is a member of al Qaida and participated in military operations against U.S. forces," including that: petitioner "admitted he threw a grenade which killed a U.S. soldier"; "attended an al Qaida training camp where he received weapons training"; "admitted to working as a translator for al Qaida"; "conducted a surveillance mission

... to collect information on U.S. convoy movements"; and "planted 10 mines against U.S. forces in ... a choke point where U.S. convoys would travel." *Id.* at 11.

**9.** The documents also state that petitioner "chose not to participate in the Tribunal process." *Id.* at 8–9.

**10.** The amended petition is styled not only as a petition for a writ of habeas corpus, but also as a "Complaint for Declaratory and Injunctive Relief."

ees at Guantánamo Bay are already pending with this Court," and instructing that all of these cases "be transferred by the judge to whom they are assigned, pursuant to LCvR 40.6(a) and 40.5(e), to Senior Judge Joyce Hens Green for coordination and management." Sept. 15, 2004 Resolution at 1–2. The Resolution states that the "transferring Judge will retain the case for all other purposes." *Id.* at 2.

Accordingly, on September 21, 2004, this Court issued an order transferring this case to Senior Judge Green for coordination and management. Senior Judge Green has since issued a scheduling order for the filing of a response by the United States to show cause why the writs of habeas corpus should not be granted. Consistent with this order, the United States filed a global motion to dismiss the habeas petitions of petitioner and all other Guantánamo petitioners. Responsive papers are due from the various petitioners on November 5, 2004.

Pursuant to the Resolution, this Court in its transfer order retained the case "for all other purposes" not related to coordination and management. One of those purposes is the resolution of the present emergency motion to compel the government to allow an independent medical evaluation and to produce medical records. The motion has now been fully briefed by the parties.

### ANALYSIS

It is important at the outset to understand the exact nature of this emergency motion. Petitioners are not claiming that they require an emergency order to redress some ongoing violation of petitioner's rights that cannot await later resolution through these proceedings. So, for example, petitioners are not arguing that peti-

tioner needs an independent medical evaluation because, without it, there will be a continuing violation of the Geneva Convention (claim seven of the petition) or the Army's torture regulations (claim ten), that will cause him irreparable harm and therefore must be resolved now.[11] Such a request, which would be in the nature of a motion for a preliminary injunction, is not the motion filed here.

Likewise, petitioner is not seeking discovery on his substantive claims. That is, he is not asking for an emergency independent medical examination or the production of medical records because that evidence is relevant to the legal allegations that he makes in his habeas petition. Indeed, petitioner would not be able to obtain the relief sought on that basis, because no discovery has yet been permitted in this habeas case.

Instead, petitioner asks for emergency relief on a narrower ground. He seeks an emergency independent medical examination and the production of medical records because such relief allegedly is necessary to ensure his ability "to understand the charges against him (if and when they are actually stated by the Government), and his ability to participate meaningfully in his defense." Pet. Mem. at 11; *see also, e.g.,* Pet. Reply Mem. at 5 ("Petitioner's legal competency has been thrown into question."). That, then, is the core issue presented for decision in petitioners' emergency motion: whether it is appropriate for the Court at this time to order an independent medical examination and the production of medical records to ensure that petitioner is mentally competent to participate in his defense in some future, anticipated (but not yet scheduled) proceeding.

---

11. Indeed, although petitioners raise fifteen different claims for relief in their petition, they appeal to none of them as bases for the emergency relief presently sought.

Respondents argue that the Court has no authority to issue such an order. They maintain that the order would offend the constitutional doctrine of the separation of powers by injecting the judiciary into military decision-making about the war-time provision of medical care to enemy combatant detainees, and that the Court in any event lacks authority to issue the order under the All Writs Act, which they read as circumscribing the Court's authority to award injunctive relief to those orders that are "necessary to protect its jurisdiction." Resp. at 6–9. Petitioners reply that any argument that the relief they seek is foreclosed by the separation of powers does not survive *Rasul v. Bush,* 124 S.Ct. 2686 (2004), where they say the Supreme Court rejected similar arguments that the Court's habeas authority would interfere with the executive's conduct of the war against al Qaeda. *See* Pet. Reply Mem. at 2–3. Petitioners also maintain that the Court's authority to issue orders under the All Writs Act is expansive, and even if it were not, the Court would have the power to issue the order requested here pursuant to its inherent judicial and habeas powers. *See id.* at 4–6.

It is not necessary for this Court to address the contours of its authority to issue the relief sought by petitioners. For, even assuming there is authority to provide such relief, this Court concludes that it would be inappropriate. to exercise that authority in this instance.

## I. The Right to a Mental Competence Determination

■ As discussed above, petitioners' emergency motion as it has evolved is premised on the argument that an independent medical examination and the release of medical records is necessary to ensure petitioner's ability to understand any charges that are brought against him by the United States and to participate meaningfully in his own defense. *See* Pet. Mem. at 11. This argument, however, immediately runs into a problem: As petitioners must admit, no criminal charges have been brought against petitioner at this time. *See id.* Petitioners do not even claim that there is reason to believe that charges will be brought at any point in the foreseeable future.

Thus, petitioners are asking this Court to intercede—before any criminal charges have been filed or there is even any prospect of criminal charges—to assess the mental competence of an individual in the custody of the United States in the event that charges eventually are brought. Petitioners do not point the Court to any precedent for the preemptive mental assessment they propose. The law, in fact, is to the contrary. *See, e.g., United States v. Copley,* 935 F.2d 669, 671 (4th Cir.1991) ("If there are no pending charges against the defendant, there is no need to determine his competency to stand trial."); *United States v. Clark,* 617 F.2d 180, 184 n. 5 (9th Cir.1980) ("The determination of legal competency by a federal court is limited to the purposes of a criminal trial in that court. It has no general effect outside those criminal proceedings.").

■ The determination of competency is limited to the time of a criminal trial. Prior to the commencement of any criminal proceedings, and after the completion of those proceedings, an assessment of mental competence is irrelevant except insofar as it bears indirectly on the defendant's capacity at the time of trial to understand the proceedings. *See, e.g., United States v. Bartlett,* 856 F.2d 1071, 1077 n. 5 (8th Cir.1988) (purpose of mental competency proceeding is to determine whether defendant "at the time of his trial" has "sufficient present ability to consult with his lawyer" (quotation omit-

ted)); *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986) ("The question of competency to stand trial is limited to the defendant's abilities at the time of trial."). In light of the fact that no charges have been pressed, and none loom in the future, it is not evident why a determination of mental competence is an "emergency" at this time, or how petitioner would suffer imminent and irreparable harm without an immediate assessment of his ability to understand proceedings that have not been commenced, and may never take place.[12] *See Martin v. Department of State,* No. 03–5070, 2003 WL 21026740, at *1 (D.C.Cir. Apr.29, 2003) (rejecting motion for emergency relief at preliminary stage of proceedings because plaintiff had not shown irreparable harm).

The Court therefore declines to initiate a medical competence assessment at this time. The relief petitioners seek would transform the mental competency issue from a narrow inquiry designed to ensure that a criminal defendant is "mentally competent to understand the nature of the charges against him and to assist in his defense," *United States v. Caldwell,* 543 F.2d 1333, 1348 (D.C.Cir.1974), into a process that draws courts into monitoring the health and welfare of any individual in the custody of the United States,[13] regardless of whether criminal charges have been brought or are likely to be brought in the future. Petitioners offer no support whatsoever for such an undertaking. To challenge the medical conditions of petitioner's confinement, petitioners should point to an actual violation of one of petitioner's legal rights or entitlements. There is simply no authority for petitioners' attempt to obtain judicial oversight of prison medical care through the backdoor of a mental competency proceeding for a non-existent criminal charge. *See Berman v. Lamer,* 874 F.Supp. 102, 106 (E.D.Pa.1995) ("Absent a showing that ... officials have engaged in constitutionally impermissible conduct, it [is] not in the public's interest for the court to usurp the [government's] authority and micro-manage the medical needs of a particular inmate.").

■ In their reply memorandum, petitioners retreat to the position that, even if a medical examination and release of medical records are inappropriate to ensure petitioner's mental competency for any future *criminal charges,* they nonetheless are necessary to guarantee his competence for the ongoing *habeas proceedings. See* Pet. Reply Mem. at 6. Petitioners' mental competency theory fares no better in this new form.

■ The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the prosecution of a criminal defendant who is not mentally competent to stand trial. *See Godinez v. Moran,* 509 U.S. 389, 394, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). To protect this right, a criminal defendant is entitled to a hearing on mental competency whenever there is sufficient evidence of incompetency. *See Pate v. Robinson,* 383 U.S. 375, 385–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *United States v. Weissberger,* 951 F.2d 392, 395 (D.C.Cir. 1991). However, these constitutional guarantees do not apply outside of criminal proceedings. *See United States v. Man-*

---

12. Respondents admit that in "the event a detainee at Guantanamo is charged with a crime, such charges are prosecuted through a military commission. The detainee would have to be mentally competent to stand trial in order for these proceedings to take place." Resp. at 8.

13. This could potentially encompass not only the detainees at Guantánamo, but also, for instance, individuals detained by the Immigration and Naturalization Service.

*dycz,* 351 F.3d 222, 225 n. 1 (6th Cir.2003) ("[A]t present, mental incompetency is only recognized as a defense to trial in criminal proceedings"). So, for example, courts have refused to recognize a right to a hearing on the defendant's mental competence in the context of deportation proceedings or naturalization proceedings. *Nee Hao Wong v. INS,* 550 F.2d 521, 523 (9th Cir.1977); *United States v. Mandycz,* 199 F.Supp.2d 671, 675 (E.D.Mich.2002), *appeal dismissed,* 351 F.3d 222 (6th Cir. 2003). In these settings, a next friend or a guardian may step in to represent the interests of an incompetent defendant. However, the proceeding is not stayed until such time as the detainee is competent. *See, e.g., Nelson v. INS,* 232 F.3d 258, 261–62 (1st Cir.2000); *Mandycz,* 199 F.Supp.2d at 675.

■ The same is true of habeas proceedings. The Supreme Court has expressly held that a habeas action may proceed through a "next friend" even when a prisoner's mental incompetence would render him incapable of bringing the action on his own behalf. *See Whitmore v. Arkansas,* 495 U.S. 149, 162, 110 S.Ct. 1717, 109

L.Ed.2d 135 (1990). Therefore, the prohibition on the prosecution of an incompetent defendant, and the accompanying right to a determination of mental competence, cannot be said to extend to habeas proceedings. *See, e.g., Laws v. Lamarque,* 351 F.3d 919, 923 (9th Cir.2003) (noting that it has not found any "right to competency in noncapital postconviction proceedings"); *Mines v. Cockrell,* No. 00–2044, 2003 WL 21394632, at *4 (N.D.Tex. May 21, 2003) (finding no legal authority for petitioner's request that his "habeas proceeding be stayed due to his alleged incompetence to assist in his own defense").

■ The logic of this principle is obvious—unlike in the criminal setting, where a defendant is subjected to a proceeding to determine his guilt at risk of his liberty, a habeas proceeding is brought by the petitioner in an attempt to obtain release. Mental incompetence may bar imposing the penalty of incarceration, but it should not preclude lifting that penalty.[14] Accordingly, there is no basis for petitioners' suggestion that an order is necessary

---

**14.** There are three narrow exceptions to the general rule that a habeas petitioner does not have a right to a determination of mental competency. None applies here.

First, the Ninth Circuit has recognized a statutory right to a determination of mental competence in the habeas review of a death penalty conviction. *Rohan v. Woodford,* 334 F.3d 803, 817 (9th Cir.2003). The court indicated that a determination of mental incompetence in this context will stay any ongoing habeas proceedings and delay the petitioner's execution. *Laws,* 351 F.3d at 923; *Rohan,* 334 F.3d at 814–16, 818–19. The Ninth Circuit has been careful to emphasize that this decision does not imply a general "right to competency in noncapital postconviction proceedings." *Laws,* 351 F.3d at 923. This line of cases is inapplicable here, for petitioner is not challenging a death penalty conviction.

Second, some courts have held that the mental incompetency of a habeas petitioner is

an "extraordinary circumstance" that will justify tolling the statute of limitations for a habeas petition. *Laws,* 351 F.3d at 923, *Worley v. Lytle,* No. 99–2103, 2000 WL 963169, at *1 (10th Cir. July 12, 2000). Petitioner makes no such argument here.

Finally, several cases have held that a court must conduct an inquiry into a death row inmate's mental competence to abandon or waive an ongoing collateral attack on a death penalty conviction and sentence. *See Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966); *Comer v. Stewart,* 215 F.3d 910 (9th Cir.2000); *Mata v. Johnson,* 210 F.3d 324, 330 (5th Cir.2000); *Ford v. Haley,* 195 F.3d 603, 617 (11th Cir.1999). Even if this rule were to apply outside the death penalty setting, petitioner is not attempting to waive or withdraw his habeas challenge.

to guarantee petitioner's competence for these habeas proceedings.[15]

For these reasons, petitioner has no legal right to an emergency order to assist in assessing his mental competence, either for any criminal charges that might be brought against him in the future, or for the habeas action that he currently pursues. A word should be added, however, about the ongoing military Combatant Status Review Tribunals (CSRTs). Each of the Guantánamo detainees is being reviewed by a CSRT, a military tribunal convened to make a determination whether the detainee is properly designated as an enemy combatant. Petitioner underwent his review in September 2004. The United States argues in its global motion to dismiss the detainee petitions that the CSRTs satisfy any due process rights to which the detainees might be entitled under the Supreme Court's recent decisions. *See* Mot. to Dismiss at 32–42. However, neither of the parties in their papers on this emergency motion address whether petitioner has a constitutional[16] or statutory right to a mental competence determination before his status as an enemy combatant can be reviewed by a CSRT.

 The absence of any mention of this issue in the parties' papers, together with the ongoing briefing of related issues on the United States' motion to dismiss, leads the Court to elect not to address the question at this time. However, even if this Court were to find that petitioner has

a right to a mental competence determination before his status is reviewed by a CSRT, the Court would still deny petitioners' emergency motion, for an independent reason: he has failed to submit evidence that raises a reasonable or *bona fide* doubt as to his mental competence.

## II. The Evidence of Mental Incompetence

 To be competent to stand trial, a criminal defendant must demonstrate an ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Godinez,* 509 U.S. at 396, 113 S.Ct. 2680; *United States v. Klat,* 213 F.3d 697, 702 n. 5 (D.C.Cir.2000). However, a court will order a mental examination of the defendant, or a hearing on the mental competence of a defendant to stand trial, only if "there is reasonable cause to believe he is incompetent to understand the proceedings or assist in his own defense." *United States v. Grimes,* 173 F.3d 634, 635 (7th Cir.1999). Where the evidence fails to raise a *"bona fide* doubt" as to the defendant's mental competency, a court will not order an independent mental evaluation. *Pate,* 383 U.S. at 385, 86 S.Ct. 836; *Weissberger,* 951 F.2d at 395; *United States v. Nickels,* 324 F.3d 1250, 1252 (11th Cir. 2003); *Mata,* 210 F.3d at 328.

 The Court is mindful of the secrecy regarding the detentions at Guantána-

15. Petitioners appeal to *Wallace v. Reno,* 194 F.3d 279, 285 (1st Cir.1999), but in that case the court merely issued a stay of deportation so that it would be able to consider a habeas petition challenging the deportation. The basis of the ruling was that a court may issue any orders necessary to "protect its authority to issue the writ" of habeas corpus. *Id.* As the cases in the text indicate, guaranteeing the mental competence of a habeas petitioner

is not necessary to protect a court's habeas authority.

16. The parties also do not raise here, and the Court does not have occasion to decide, the argument of the United States in its global motion to dismiss that detainees, as "aliens held outside the foreign sovereignty of the United States," do not enjoy any rights or privileges under the Constitution at all. Mot. to Dismiss at 19–29.

mo, driven by national security concerns, and the difficulty that presents for the collection and development of evidence. Further, unlike in most cases, the Court does not have the opportunity personally to observe the petitioner before determining whether discovery on mental competence is necessary. *See, e.g., Davis v. Woodford,* 384 F.3d 628, 645 (9th Cir.2004) (discussing relevance of defendant's demeanor before trial judge in determining mental competence). Nevertheless, even accounting for these obstacles, petitioners have failed to come forward with sufficient evidence of mental incompetency to raise a *bona fide* doubt about petitioner's mental capacity.

There is no evidence in the record that petitioner has been engaging in any sort of bizarre or irrational behavior. *See Drope v. Missouri,* 420 U.S. 162, 179, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Grimes,* 173 F.3d at 635. Petitioners do not supply information suggesting that petitioner has difficulty communicating or responding to questions, *see United States v. Graves,* 98 F.3d 258, 260 (7th Cir.1996); *United States v. Crosby,* 739 F.2d 1542, 1545 (11th Cir. 1984); that he exhibits paranoid or delusional ideas or beliefs, *see Pate,* 383 U.S. at 385, 86 S.Ct. 836; *United States v. Auen,* 846 F.2d 872, 878 (2d Cir.1988); that he has a history of psychiatric illness, *see Grimes,* 173 F.3d at 635; *Agan v. Dugger,* 835 F.2d 1337, 1339 (11th Cir.1987); or that he has a severe loss of memory, *see Crosby,* 739 F.2d at 1545–46; *Wilson v. United States,* 391 F.2d 460, 463–64 (D.C.Cir.1968).[17] There is simply no indi-

cation at all that petitioner presently lacks a "rational as well as factual understanding" of his circumstances. *Godinez,* 509 U.S. at 396, 113 S.Ct. 2680.

In fact, there is evidence that just the opposite is true. The communications between petitioner and his family members since his detention show him engaged in rational discussion and logical thought. Petitioner's grandmother reports that petitioner, in a conversation with his older brother at Guantánamo, "expressed concerns over his health and the fact that, without medical attention, he would completely lose the sight in his left eye." Elsamnah Aff. ¶ 48. Petitioner's grandmother also claims to have "received several messages from her grandson expressing concern over his detention." Petition ¶ 4. These communications, limited as they are, reveal a young man who is aware of his physical problems and concerned for his welfare, not an individual who is incapable of consulting with his lawyer or participating in a "rational understanding" of what is occurring around him.[18]

This conclusion is consistent with the medical information submitted by the respondents, indicating that petitioner has _____ one would expect relating to his detention but is otherwise _____. To rebut this account, petitioners offer the declarations of Dr. Trupin, a child and adolescent psychologist who, without having the opportunity to interview petitioner, states that it is "extraordinarily unlikely" that an adolescent in the position of petitioner "does not suffer from more severe residual

---

**17.** The court does not mean to suggest that any of these pieces of evidence standing alone would suffice to raise a *bona fide* doubt of mental capacity, but rather simply that they have all been found relevant in prior cases, and petitioners are unable to cite evidence of any of them here.

**18.** According to his grandmother, petitioner enjoyed a relatively healthy childhood. She reports that he "enjoyed school, loved to read, and worked hard to achieve in class." Elsamnah Aff. ¶ 19. Petitioners do not point to anything indicating that his capability for rational thought has changed in the years since he was detained.

psychological effects" than those identified in the submissions of the United States. Trupin Reply Decl. ¶ 5. Dr. Trupin concludes "to a reasonable scientific certainty" that petitioner is "at significant risk" of disorders such as "psychopathology," "depression" and "aggressiveness." Trupin Decl. ¶ 17.

The Court has no reason to doubt Dr. Trupin's medical opinion that the physical trauma and isolation he would expect petitioner to have experienced places him at a significant risk of these maladies. However, even if the Court were inclined to credit the opinion that petitioner is at a significant risk of such effects as evidence that he actually has these maladies, there remains a critical difference between the psychiatric issues identified by Dr. Trupin and the severe mental impairment that would cause petitioner to be incapable altogether of rational thought. *See, e.g., United States v. Teague,* 956 F.2d 1427, 1431–32 (7th Cir.1992) (evidence that defendant had been diagnosed with "major depression, generalized anxiety, and borderline personality disorder" was insufficient to show mental incompetence); *United States v. Davis,* 61 F.3d 291, 304 (5th Cir.1995) (evidence that defendant had attempted suicide and was "depressed but alert" does not raise a *bona fide* doubt as to mental incompetence).

On that score, the most Dr. Trupin can offer is that the conditions of petitioner's confinement "may cause" an impairment in his "ability to understand the legal consequences of the charges made against him." [19] Trupin Decl. ¶ 16. This statement is simply too speculative to create a *bona fide* doubt as to petitioner's mental competency, such that an independent mental examination would be warranted. Dr. Trupin's opinion is not premised on any facts that indicate that this is presently petitioner's state of mind, and it does not attempt to square its conclusion with the alleged communications from petitioner that appear to show a "rational as well as factual understanding" of his situation. *Godinez,* 509 U.S. at 396, 113 S.Ct. 2680. This sort of abstract and conclusory opinion does not furnish a reasonable basis for a conclusion that petitioner is incompetent. *See Demosthenes v. Baal,* 495 U.S. 731, 736–37, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (finding no evidence of mental incompetence where psychiatrist's affidavit "was not based on personal examination" and "stated only in conclusory and equivocal fashion" that defendant "may not be competent"); *United States v. Cruz,* 805 F.2d 1464, 1479 (11th Cir.1986) (finding no bona fide doubt as to competency where doctor's conclusion that defendant was incompetent was speculative and based on a single meeting with petitioner).

Petitioners cannot blame their inability to supply evidence raising doubts as to petitioner's competence entirely, or even largely, on the inaccessibility of petitioner at Guantánamo. There are several individuals who have had contact with petitioner. Some of these encounters, such as that between petitioner's older brother and petitioner, are in the record (in a fashion [20]

---

**19.** To repeat the obvious, and as explained *supra,* there are no current or threatened charges against petitioner.

**20.** This discussion is described in an affidavit written by petitioner's grandmother. *See* Elsamnah Aff. ¶ 47. The affidavit does not explain how she came to know of the details of this communication. One can surmise that

she was told of the conversation by petitioner's older brother, who evidently was released from Guantánamo (although he has not submitted any declaration to the court on his own). This is hearsay, to be sure, and it could be several layers of hearsay at that if she heard of the discussion through a third party. However, since "the issue is whether evidence must be taken," courts are permis-

) but do not reveal any signs of mental incompetence. Other contacts, such as the letters from petitioner to his grandmother, are referred to in the pleadings but not submitted for review by the Court; yet even these do not appear to furnish any evidence of mental incompetence. Finally, three British citizens who were once at Guantánamo but have been released have written about the treatment of petitioner at the facility. However, these ex-detainees have not submitted to the Court any sworn affidavits or other evidence of their discussions, and what they have reported, although troubling, does not shed any light on whether petitioner lacks the "rational understanding" of his situation that is required for a mental competence determination.

The account that has emerged from Guantánamo is that petitioner is concerned for his welfare, and is in physical discomfort, but that he has control of his mental faculties. Were there evidence to the contrary, the Court is convinced that petitioners, or one of the individuals who has talked to petitioner, would bring it to the attention of the Court. At this juncture, however, petitioners have not come forward with evidence that would give rise to a *bona fide* doubt regarding petitioner's mental competence to stand trial or otherwise participate in his defense. Accordingly, even if there were a proceeding—the anticipation of criminal charges, this habe-

as action, or the CSRT—that entitled petitioner to a determination of mental competency, he has failed to produce evidence that would place his mental competency in question at this time. Therefore, in view of the record as it currently exists, petitioners' emergency motion for an independent medical evaluation and the production of medical records must be denied.[21]

## III. The Right to Physical and Mental Well-Being

On occasion, petitioners have hinted at a broader and more sweeping claim. Petitioners might be taken to suggest that the Court bears an affirmative responsibility to ensure the physical and mental well-being of petitioner, in light of his status as a minor, his serious physical injuries, the views of many that conditions at Guantánamo are too harsh (and inappropriate for juveniles), and reports that medical care has been withheld as an interrogation tool or as a means of punishment, even perhaps as to petitioner in particular.[22] *See, e.g.,* Pet. Mem. at 8 ("An immediate medical examination and the release of medical records are necessary to ensure O.K.'s well-being and to effectuate this Court's *habeas* jurisdiction."); Pet. Reply Mem. at 1 ("Respondents' opposition ... seeks to paper over the legitimate concerns regarding Petitioner's physical and mental health."). Such an argument must be assessed against the background of a consis-

---

sive in the kinds of "evidence" they will consider in determining whether discovery or a hearing on competence is necessary. "Anything that points to the need for evidence is admissible to help the judge decide whether reasonable cause for an evidentiary hearing exists." *Grimes,* 173 F.3d at 636. Despite this liberal standard, petitioners have been unable to provide any evidence of mental incompetence here.

**21.** Having once denied a competency examination, the Court retains the authority to or-

der a medical review or a hearing later if events warrant. *Drope,* 420 U.S. at 178–82, 95 S.Ct. 896 ("[A] trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").

**22.** In fairness, this may only be the Court's reading of petitioners' apparent arguments—they may not be intending to assert such a claim at all.

tent body of law reflecting the reluctance of courts to second-guess the medical treatment provided to prisoners by government officials.

 Although petitioner does not assert a constitutional violation (or any other violation of a substantive legal right) in the present motion, the issue of a dereliction of medical care for a person detained by the government usually arises in the context of constitutional challenges to prison conditions. The Supreme Court has emphasized on several occasions that a claim of deficient medical care will not be cognizable under the Constitution unless a prisoner can show a level of dereliction so grave that it amounts to a "deliberate indifference" to the prisoner's "serious medical needs." *Neitzke v. Williams*, 490 U.S. 319, 321, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prisoner challenging his medical care must be prepared to show that officials "were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety." *Scott v. District of Columbia*, 139 F.3d 940, 943 (D.C.Cir.1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).[23]

 This standard means that "courts will not intervene upon allegations of mere negligence, mistake or difference of opinion." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977); *see also Estelle*, 429 U.S. at 106, 97 S.Ct. 285 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Absent a showing of misconduct that rises to the level of deliberate indifference, courts will not sit as boards of review over the medical decisions of prison officials, and they will not second-guess the adequacy of a particular course of treatment. *Bowring*, 551 F.2d at 48; *see also Berman*, 874 F.Supp. at 106 ("[I]t is not in the public's interest for the court to usurp the Bureau of Prisons' authority and micromanage the medical needs of a particular inmate."). In particular, a prisoner has no discrete right to outside or independent medical treatment. *See Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir.1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

 Petitioners do not explain why these principles should be diluted in the context of military detention centers. Accordingly, these decisions, and the role they suggest for courts in the review of allegations of prison misconduct, frame the analysis here.[24] To be sure, a court will

**23.** The "deliberate indifference" standard was developed to assess the claims of prisoners under the Eighth Amendment. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285. The standard of care for a pre-trial detainee who has not yet been convicted, however, is governed by the Due Process Clause of the Fifth and Fourteenth Amendments rather than by the Eighth Amendment. *See, e.g., Hill v. Nicodemus*, 979 F.2d 987, 990 (4th Cir.1992). Although the Supreme Court has said that the due process rights of pre-trial detainees are "at least as great" as the Eighth Amendment rights of a convicted prisoner, *see City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103

S.Ct. 2979, 77 L.Ed.2d 605 (1983), most courts have applied the "deliberate indifference" standard in both settings, *see Hill*, 979 F.2d at 991–92 (collecting cases). Without concluding that the "deliberate indifference" doctrine is the correct standard for any constitutional claims that petitioners might raise in this case, the Court will draw on this well-developed body of law to guide its analysis on this emergency motion.

**24.** As explained below, this discussion should not be taken to suggest that petitioners necessarily are entitled to these constitutional protections, or even that petitioners claim that

not hesitate to intervene if a prisoner can identify a dereliction of duty so grave that it violates the prisoner's constitutional rights (or any other rights the prisoner might possess). However, to make this showing, a prisoner will generally have to combine two things: a claim under either the Constitution or some other source of legal rights that allows petitioner to challenge the conditions of confinement, together with sufficiently competent evidence of mistreatment to support the claim. Petitioners satisfy neither of these requirements in their emergency motion.

As to the first point, petitioners' emergency motion is not based on any claim of an actual violation of legal rights. They do not maintain that any of the legal claims set out in their habeas petition support the relief they seek in this motion, and they do not attempt to base their request for relief in any other legal right or entitlement. Instead, they seem to propose that the Court has some free-floating responsibility to ensure the general welfare of petitioner pursuant to its powers under the All Writs' Act and its inherent judicial and habeas authority. The principles discussed above essentially foreclose that result in this context: The Court is exceptionally reluctant to monitor the medical care of detainees in the absence of a colorable assertion of some substantive violation of a legal right. The Court does not reach the issue, or offer its views regarding, whether the allegations in petitioners' habeas papers are sufficiently grave to support a claim that one of petitioner's rights was violated. It is enough to say that petitioners do not

make any such claim in their emergency motion.[25]

Even if petitioners were alleging in this motion that Guantánamo officials are violating his legal rights, petitioners would still have to come forward with direct and competent evidence of the violation. Here, petitioners have provided newspaper and other accounts by ex-detainees of alleged torture and the withholding of medical care as to detainees at Guantánamo (including petitioner). Such allegations are certainly cause for concern. However, respondents have supplied the Court with a sworn declaration from Dr. Edmondson, the commander of the medical services at Guantánamo, describing in substantial detail a high level of medical care provided at the facility. This account is largely corroborated by the accounts of newspaper reporters who have been taken on tours of the facility. Dr. Edmondson also swears under oath that petitioner is _____." Edmondson Decl. ¶¶ 10. To rebut this testimony, and obtain the extraordinary relief they seek through this motion, petitioners would need to submit a more concrete and competent form of evidence than that presently before the Court. As currently framed and supported, then, petitioners' emergency motion is simply not an appropriate vehicle to assess the important, and potentially difficult, issues posed by general allegations of torture of detainees or intentional withholding of necessary medical care.

## CONCLUSION

Accordingly, petitioners' emergency motion to compel the government to allow an

they are entitled to these rights in their emergency motion, but rather only that any claim of a violation of a right to medical care must generally adhere to these principles.

**25.** The analysis does not change because petitioner was a minor when he arrived at Guan-

tánamo. Whatever additional rights, if any, petitioner may have enjoyed when he was a juvenile, he is now an adult, and petitioners seek only prospective relief in the form of a future medical assessment.

independent medical evaluation and to produce medical records is denied.

### ORDER

Upon consideration of petitioners' emergency motion to compel the government to allow an independent medical evaluation and to produce medical records, it is for the reasons stated in the memorandum opinion issued on this date hereby ORDERED that the motion is DENIED.