**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Arlington CROSBY and John
Doe, a/k/a John Howard Hirsch,
Defendants-Appellants.**

No. 83–3328.

United States Court of Appeals,
Eleventh Circuit.

Aug. 27, 1984.

Ronald E. Clark, Palatka, Fla., for Crosby.

Archibald J. Thomas, III, Howard W. Skinner, Asst. Federal Public Defenders, Jacksonville, Fla., for Doe.

Ernst Mueller, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, JOHNSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The defendants appeal from their convictions of conspiracy to manufacture methamphetamine, a Schedule II controlled substance, and of possession of phenyl acetone (P2P), also a Schedule II controlled substance, with intent to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846. The defendants' activities came to the attention of the Drug Enforcement Administration, following a phone call from an employee of a chemical company, who indicated that Hirsch had contacted her in an effort to purchase P2P.

The DEA furnished P2P to the chemical company employee, who in turn sold it to Hirsch. Following the sale at the chemical company, Hirsch left in a car driven by defendant Crosby; they managed to evade DEA agents who were following them, and in the interim disposed of the P2P, which was never found. DEA agents later arrested Hirsch at a house rented by Crosby where both defendants were living (the 2 Oceanside residence), and undertook a concededly illegal search of the home. The government subsequently discovered a written lease for a structure several miles from the 2 Oceanside residence (the dome house), naming Hirsch as the lessee, and cosigned by Crosby. Crosby claimed the government agents discovered the lease at the illegally searched 2 Oceanside residence, but the record was not made clear with respect to this fact. A search of the dome house pursuant to a search warrant produced chemical equipment and written instructions used in the production of methamphetamine and P2P, and this prosecution ensued.

I. Whether the Trial Court Committed Reversible Error When It Declined to Accept Defendant Hirsch's Plea of Guilty.

On March 30, 1983, John Howard Hirsch filed notice of his intention to plead guilty on Count II of the indictment, possession with intent to manufacture a controlled substance. The following hearing was held on the notice on April 4, the morning of trial:

THE COURT: Now, one other matter before we bring the jury in. Mr. Thomas, you have filed a notice of intention to plead guilty to Count II of this indictment.

MR. THOMAS: That's correct, Your Honor.

THE COURT: That comes much too late. The plea date in this case was February 21, 1983.

MR. THOMAS: I was never informed of that, Your Honor.

THE COURT: Pardon?

MR. THOMAS: I was never informed that February 21, 1983 was the deadline for pleading guilty. I was told by the Court, my recollection was that February 21, 1983 was the deadline for any plea agreements. However, we have no plea agreement in this case.

THE COURT: Well, I don't know what your strategy is, what tactical advantage you think you might get by pleading guilty to Count II and going to trial on Count I. In my experience I've never had this happen before, but I don't intend to accept that plea at this time. I'm going to put the government to its proof.

(Record Vol. 1A at 38–39).

 A trial court may refuse to accept a guilty plea within its sound discretion; unless the refusal is without justification and the court is thereby shown to have abused its discretion, the ruling will not be disturbed on appeal. *United States v. Hamilton*, 492 F.2d 1110, 1114 (5th Cir. 1974). The justification for refusing to grant Hirsch's request to plead guilty to Count II in this case, is unclear at best. The February 21 cutoff date to which the court referred applied explicitly to "plea agreements," and not outright pleas of guilty.[1] Moreover, the government never objected to Hirsch's notice of intent to plead guilty, either in writing or at the hearing. In short, no lucid explanation exists or was given as to why the plea was rejected.

Nevertheless, Hirsch has been unable to demonstrate that the district court's decision to put the government to its proof, prejudiced his defense in any way. The defendant's suggestion that had his plea as to Count II been accepted, the government might have been willing to drop the charges as to Count I in return for Hirsch's cooperation in the prosecution of Crosby, is wholly speculative. Absent a showing of prejudice, any error committed by the trial court in declining to accept the guilty plea does not warrant reversal. *United States*

*v. Hamilton*, 492 F.2d 1110, 1115 (5th Cir. 1974).

II. **Whether the District Court Erred in Refusing Hirsch's Request for an Instruction on the Issue of Entrapment.**

 The evidence in this case conclusively established that it was not until after Hirsch approached the chemical company and attempted to purchase P2P that the government became involved. The government did no more than furnish the chemical that Hirsch had actively sought to procure. Well before the occurrence of this transaction, Hirsch had amassed virtually all of the materials needed to manufacture the controlled substances for which he was tried and convicted in this case.

It is settled in this circuit that the defense must produce evidence that shows government inducement. Further, the nature of the required showing is that some evidence must be shown, but more than a scintilla must be presented. [citation omitted]. If this level of evidence is met, then the entrapment instruction should be given.

*United States v. Lee*, 694 F.2d 649, 653 (11th Cir.1983). In light of the complete absence of evidence indicating that the government in any way induced Hirsch to purchase P2P or to manufacture methamphetamine, the district court properly declined to give an entrapment instruction.

III. **Whether the District Court Erred in Denying Defendant Crosby's Motion for a Continuance for the Purpose of Having Crosby Undergo a Psychiatric Examination to Determine Competence Pursuant to 18 U.S.C. § 4244.**

On the day the trial was scheduled to begin, Crosby filed an "amended motion for a continuance," requesting that the trial be postponed pending extensive testing of Crosby by a neurologist. Crosby's attorney had previously indicated in his original motion for continuance, that "counsel has had a very difficult time communicat-

---

**1.** On February 11, a status conference was held in open court, at which time it was determined that the "cutoff date for *plea agreements* is set

for February 21, 1983." (Record Vol. 1 at 80) (emphasis supplied).

ing with the Defendant, getting very illogical responses and a definite display of loss of memory as to the events surrounding the alleged crime." (Record Vol. 1 at 89). In support of his amended motion, Crosby proffered the testimony of his personal physician, Dr. William Thompson.

Dr. Thompson testified that Crosby suffered from cortical atrophy, a neurological disorder that causes the thought process areas of the brain to shrink, the net effect of which is to interrupt the patient's ability to think logically. Dr. Thompson indicated that Crosby had complained of debilitating headaches over the course of the previous two years, and that after an automobile accident in January 1983, Crosby reported that the headaches had become worse. The doctor further noted that Crosby could not recall any details of the accident, and was unable to remember so much as whether the emergency room physician had wanted to operate on him. In response to a direct question of whether Crosby would have recall sufficient to aid his counsel in assisting him in the defense, Dr. Thompson replied "I don't know"; he emphasized that he was not an expert, and indicated that such questions were better answered by Dr. Heillman, a neurologist who was available to examine Crosby within three weeks. (T. v. 1 at 13–14). Following Dr. Thompson's testimony, and brief argument from counsel, the district court ruled as follows: "Well, let the record reflect the Court is satisfied that the defendant is competent to stand trial, and accordingly the amended motion for continuance will be denied."

■ Although Crosby's motion was styled as one for continuance rather than for judicial determination of mental competency pursuant to 18 U.S.C. § 4244, it is clear that the court and parties understood the substance of the motion to call Crosby's competence into question. Indeed, at the outset of the hearing, counsel for the government stated "I think we should hear Dr. Thompson's testimony and—on the issue of whether or not Mr. Crosby is competent to proceed. That's what I see the issue as being. This is a sort of indirect raising of incompetence is the way I see it," to which the court responded "All

right. Let's hear Dr. Thompson." Accordingly, the provisions of 18 U.S.C. § 4244, outlining the procedures employed when the court or counsel for either party moves for a determination of the defendant's competency to proceed, were triggered in this case.

Title 18 U.S.C. § 4244 provides that if counsel for either party or the court "has *reasonable cause* to believe" that the defendant *"may be* presently ... so mentally incompetent as to be unable to assist in his own defense, he shall file a motion for a judicial determination of such mental competency...." Provided that a party so moves, and the movant has reasonable cause to believe that the defendant may be incompetent to proceed, the district court *"shall cause* the accused to be examined by at least one qualified psychiatrist who shall report to the court." Crosby's counsel moved for what was recognized by all present as a judicial determination of competency, yet the court did not cause Crosby to be examined, as counsel requested. The court's failure to do so was improper unless Crosby's attorney lacked reasonable cause to believe the defendant may be incompetent.

The Fifth Circuit's decision in *United States v. McEachern,* 465 F.2d 833 (5th Cir.1972), is highly instructive to the court in its resolution of the case before it today. There, as here, defense counsel moved for a competency determination shortly before trial; a hearing ensued, following which the district court ruled that the defendant was competent to proceed without first causing the defendant to be examined by a psychiatrist. Likewise, there, as here, the government did not contend that the motion was in bad faith, or frivolous except to the extent that it lacked reasonable cause.

Turning to the question of whether defense counsel's allegations constituted reasonable cause, the *McEachern* court admonished that the "inquiry is not to reasonable cause to believe that the accused *is* insane or lacking in requisite competency, but to reasonable cause to believe that he *may be ...* " *Id.* at 838 (emphasis in origi-

nal). McEachern's motion made reference to a statement by the defendant to his counsel, that during a previous confinement he had been diagnosed as psychotic and that medical officers had recommended his commitment to a state institution. The court went on to hold that absent "additional data having been furnished or elicited, the court was left with the bare factual statements of the motion itself, which alone were sufficient to constitute reasonable cause to believe that appellant *might* lack requisite competency." *Id.* at 838 (emphasis in original).

 Similarly, there was uncontradicted evidence here that Crosby *might be* incompetent to proceed. Dr. Thompson did not pretend to be a neurological expert and thus declined to give an opinion as to whether Crosby was or was not competent. But the clear thrust of his testimony was that on the basis of his concededly limited experience, there was a very definite cause for concern that Crosby might not be able or competent to proceed, for which reason the doctor urged that an expert be appointed. The district court held that Crosby was competent upon the mistaken assumption that it was to determine whether there was reasonable cause to believe the defendant *was* as opposed to *may have been* incompetent. Because the uncontroverted testimony of Dr. Thompson, in conjunction with defense counsel's expressed inability to communicate effectively with his client, created probable cause to believe that Crosby may not have been competent, the case must be remanded for a competency determination in accordance with the provisions of 18 U.S.C. § 4244.

IV. Suppression of the Dome House Evidence.

Crosby also argues that the government learned of the dome house laboratory as a result of information obtained from the illegal search of Crosby's residence at 2 Oceanside; insofar as the government gave the defendants written notice that they would not use physical evidence seized at the 2 Oceanside residence, evidence seized at the dome house amounted to fruit of the poisonous tree, and should have been sup-

pressed. It is the government's position that Crosby failed to move for suppression of the evidence in question in advance of trial, as required by Rule 12(b)(3) of the Federal Rules of Criminal Procedure, and that under Rule 12(f), failure to comply with 12(b)(3) constitutes a waiver.

Rule 12 of the Federal Rules of Criminal Procedure requires that motions to suppress evidence be made prior to trial:

**(b) Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

⋯ ⋯ ⋯ ⋯ ⋯

(3) Motions to suppress evidence;

⋯ ⋯ ⋯ ⋯ ⋯

**(f) Effect of Failure to Raise Defenses or Objections.** Failure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

We must then turn to the procedural facts of this case in an effort to determine whether the defendant waived his right to have the dome house evidence suppressed by failing to move for suppression prior to trial.

All parties in this case agreed to follow an omnibus discovery procedure, and on January 25, 1983 completed and filed the omnibus discovery forms in open court. (Record Vol. 1 at 30). Section V of the omnibus discovery order provides as follows:

V. *Motions by Defendant.* That the defendant moves:

(a) to suppress physical evidence in the government's possession on the grounds of:

(1) illegal search and seizure.

(2) illegal arrest.

Crosby indicated on the form that he was so moving, while Hirsch indicated that he would reserve his motion. (Record Vol. 1

at 54–55; 40–41). At the time the omnibus discovery forms were filed, the court scheduled a hearing on the defendants' motions to suppress for February 8, and ordered that motions be filed by February 4. Prior to the February 4 filing date, the government communicated to both defendants its intention not to use evidence obtained at the 2 Oceanside residence. (Record Vol. 2 at 4–5). Hirsch filed his motion to suppress by February 4, but Crosby did not.[2] (Record Vol. 1 at 63–65). At the February 8 hearing, counsel for Crosby did not appear, and the court indicated that Crosby's attorney had said that he was not filing a motion to suppress. (Record Vol. 2 at 4).

The trial began on April 4. On April 5, the government was about to introduce the lease agreement signed by both defendants for the dome house property, when Crosby objected and the following colloquy took place:

> MR. CLARK [counsel for Crosby]: If it please the Court, we have reason to believe that the next exhibit that the Government will attempt to introduce was found in the house at 2 Oceanside. Therefore it would be violative of their notice of intent not to use such evidence, and also it would bring the poison tree doctrine because this particular piece of evidence, if in fact it was found in the 2 Oceanside, is what led agents ultimately to the other evidence for which it is listed on the Government's exhibit list....
>
> THE COURT: I don't know what you're talking about.
>
> MR. MUELLER [United States Attorney]: Well, what he's talking about is that there were certain items of evidence seized at 2 Oceanside where they were arrested and we indicated that we would not use physical evidence seized at that location. This particular agreement, however, I know of no document like this at 2 Oceanside, and we obtained it by contacting the realtor and the realtor furnished the agreement to us. So, I mean, the—I mean, there is no mistaking predicate or the assumption leading to this.
>
> MR. THOMAS [counsel for Hirsch]: It was a copy of this agreement that was found at 2 Oceanside and by finding that copy, that's what gave them the information to be able to go to that realtor to get the original.
>
> MR. MUELLER: That's not true.
>
> MR. THOMAS: That's not?
>
> MR. MUELLER: No, that's not true.
>
> MR. CLARK: We don't know that because there's been no independent source shown.
>
> MR. MUELLER: Well, I'll be happy to let the Court know how we found it. Frankly, I find it remarkable that you are raising it at this late date.
>
> MR. THOMAS: We raised it earlier, but you precluded us from having a hearing on it by saying you weren't going to introduce any evidence from that location.
>
> MR. MUELLER: I will be happy to tell the Court how we got that agreement, but I want to do it—
>
> MR. THOMAS: How you found out to go to the real estate company, that wasn't from evidence that you got from 2 Oceanside?
>
> MR. MUELLER: Well, I would be happy to tell the Court where I got it. I don't particularly want to tell you.
>
> MR. THOMAS: If you would just state that it didn't come from 2 Oceanside, that would satisfy me.
>
> MR. MUELLER: Well—well, I would rather tell the Court—
>
> THE COURT: Did it come from 2 Oceanside or didn't it?
>
> MR. MUELLER: This agreement? This agreement did not come from 2 Oceanside.

---

2. The substance of Hirsch's motion to suppress was different from that at issue in Crosby's motion in this appeal. At the February 8 hearing, Hirsch argued that information he had given the police at the time of his arrest after allegedly waiving his *Miranda* rights, was in fact illegally obtained, and must therefore be suppressed. The court denied the motion and Hirsch does not appeal that ruling.

THE COURT: Well, did the—did you obtain Goodrich's name from 2 Oceanside?

MR. MUELLER: I came—the knowledge of the agreement came from the mouth of a witness, of a person, of an individual, period. It did not come from any—in other words, somebody told us that this rental agency knew something about this. We went to the rental agency, period. No document at 2 Oceanside.

MR. THOMAS: Did the information that you got from the witness, was that witness in 2 Oceanside at the time that place was searched?

MR. MUELLER: Well, I mean, that's—I'm not going to answer that unless I'm required to.

THE COURT: I don't think it makes any difference; let's go. Objection overruled.

(Record Vol. 5 at 153–55). Crosby renewed his objection on the same grounds, when the government introduced the chemical equipment and other evidence obtained from the dome house. (Record Vol. 5 at 169).

■ Assuming that Crosby's failure to move for suppression of the lease and dome house evidence prior to commencement of trial would amount to a waiver under F.R.Crim.Pro. 12(f), the merits of the motion are nevertheless properly before us if the district judge entertained argument and ruled on the merits of the motion:

> Appellants did not make a pre-trial motion to suppress the evidence of the suitcases as required by Fed.R.Crim.P. 12(b) and first raised this motion at trial. Under Rule 12(f) this waived the issue, and the district court would not have abused its discretion under Rule 12(f) if it had denied the motion solely on the ground of appellants' non-compliance with pre-trial procedure. [citations omitted].
>
> However, the district court did not rely solely on appellants' pre-trial omission, but rather heard argument on the motion to suppress. We thus consider the merits of the trial court's ruling.

*United States v. Marx,* 635 F.2d 436, 440–41 (5th Cir. Unit B 1981). See also *United States v. Contreras,* 667 F.2d 976, 978 n. 2 (11th Cir.1982). In this case, the district court did not reject Crosby's motion as untimely, notwithstanding the government's objection that it was raised "at this late date." Rather, the court heard argument on the motion and rejected it on its merits; it is therefore appropriate for us to consider the substance of the trial court's ruling.

Crosby contends that the government was made aware of the dome house as a result of its concededly illegal search of the 2 Oceanside residence; therefore, the dome house evidence must be excluded as fruit of the poisonous tree.

The exclusionary rule bars evidentiary "fruit" obtained "as a direct result" of an illegal search or an illegal coercive interrogation. [citations omitted]. Its bar only extends from the "tree" to the "fruit," however, if the fruit is sufficiently connected to the illegal tree:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

[citations omitted].

One form of insufficient connection between fruit and tree occurs if physical evidence, a witness' testimony, or the accused's statement has an attenuated link to the illegally secured evidence. [citations omitted]. Another type of inadequate connection arises if the derivative evidence has an independent source from the illegally taken objects or statements. [citations omitted]. A third category of insufficient connection obtains if the derivative evidence ... would inevitably have been discovered during a police investigation without the aid of the illegally obtained evidence."

*United States v. Brookins,* 614 F.2d 1037, 1041–42 (5th Cir.1980) (footnote omitted).

 The question, then, is whether the fruit of the dome house search was obtained as a direct result of information gleaned during the search of the 2 Oceanside residence. Once it is established that the government conducted an unlawful search (conceded here), and the defendant moves to suppress evidence proffered by the government on the grounds that it is fruit of the poisonous tree, the burden is on the government to show that such evidence was not obtained as a direct result of the illegal search. *United States v. Brookins,* 614 F.2d 1037, 1048 (5th Cir.1980); *see also* C. Wright, *Federal Practice and Procedure* § 677.

In this case, the district court stopped short of requiring the government to state the circumstances in which it became aware of the dome house. The government made rather vague allusions to some unnamed third party as the source of its information, but the circumstances in which the government came into contact with such a party were never revealed. On the one hand, "where the actions of a third party, rather than the illegal police conduct, are responsible for the creation of the challenged evidence, the taint caused by the original illegal conduct is thereby purged." *United States v. Brown,* 628 F.2d 1019, 1022 (7th Cir.1980). On the other hand, if information as to the existence of the dome house was elicited from an unnamed third party as a direct result of the illegal search, suppression may be in order. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *cf. United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

The convictions of John Howard Hirsch are affirmed. With respect to David Crosby, the case is remanded to the district court. Upon remand, the court must determine first if a nunc pro tunc hearing as to Crosby's competence is possible, and if so whether he was competent to stand trial in April of 1983. *See United States v. Makris,* 535 F.2d 899 (5th Cir.1976). In the event that Crosby is ultimately deemed competent to have stood trial in 1983, it will be necessary for the court to determine second, the circumstances in which the dome house evidence was obtained and whether in light of those circumstances such evidence must be suppressed. If Crosby is found to have been competent to stand trial and if the evidence secured from the dome house was not required to be suppressed, his convictions shall stand; otherwise, they must be set aside.

AFFIRMED IN PART, REMANDED IN PART.