[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15832
_____

D.C. Docket No. 0:11-cr-60093-WJZ-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RONALD FRANK TIMMANN,
a.k.a. Ronald Frank Timmann,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 18, 2013)

Before TJOFLAT, PRYOR, and FAY, Circuit Judges.

TJOFLAT, Circuit Judge:

Ronald Frank Timmann appeals his conviction for possession of a firearm

by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (2010), arguing that the

District Court erred in denying his motions to suppress firearms and ammunition seized from his apartment and telephone statements he made to police officers, after the officers' warrantless search of his apartment. For the reasons that follow, we vacate the District Court's judgment, and remand for further proceedings not inconsistent with this opinion.

I.

On February 28, 2011, at 2:05 PM, Officer Claudette Martin of the Sunrise Police Department received a dispatch regarding a service call. The caller, Cathleen Carr, reported a suspicious hole in the wall at her apartment, #204, in the apartment complex located at 9360 Sunrise Lakes Boulevard.

Officer Martin went to Carr's apartment, where Carr told Officer Martin that she had been away on a business trip from the afternoon of February 17, 2011, until about 10:00 PM on February 27, 2011. The night of her return, Carr noticed a small hole in her bedroom wall, another hole in a nearby chair, and a third hole in the carpet near the chair. The bedroom wall in which she found the hole abutted the apartment next door, #205. Carr thought that the holes might have been caused by a bullet, and showed Officer Martin what she believed was a bullet fragment lodged under the carpet.

Officer Martin surveyed the holes. She suspected that the object under the carpet was a bullet, and made an attempt to recover it, but was unable to do so.

2

Officer Martin asked Carr who lived in apartment #205. Carr told her that Timmann lived there alone, and that she had not seen him since she returned from her trip. Carr also mentioned that she had seen Timmann's work vehicle, a limousine, in the building's parking lot the previous night, February 27.

Officer Martin checked the parking lot, and did not see Timmann's limousine there. She knocked several times on the door of apartment #205, identifying herself as a police officer, but received no answer. Officer Martin then contacted dispatch at the Sunrise Police Department and asked if any service calls had been made between February 17 and February 27 from the apartment complex at 9360 Sunrise Lakes Boulevard. Dispatch told her that no service calls had been made, including calls reporting gunshots or disturbances, or requesting medical assistance. Then, after telling Carr that she may need to return at a later time to perform a further investigation, Officer Martin "cleared the service call" (i.e., she reported that her investigation at 9360 Sunrise Lakes Boulevard was complete and that she was available to handle another call), and returned to her patrol.

The following day, March 1, 2011, at approximately 11:00 AM, Officer Martin contacted Officer Michael Calise and asked him to meet her at 9360 Sunrise Lakes Boulevard, saying that she needed his help to "further investigate." Officers Martin and Calise met at the apartment complex between 11:05 AM and

11:45 AM.  Officer Martin then told Officer Calise what she had seen in Carr's apartment the previous day.

Using the key that Carr had left for them, the two officers entered Carr's apartment.  Officer Calise examined the hole in the wall and determined that it had been made by a bullet.  The officers moved furniture, pulled up the carpet, and found a bullet, or bullet fragment, underneath the carpet.  Officer Martin testified that she then took photographs of the scene in Carr's apartment, although Officer Calise did not recall any photographs being taken at this point.  Officer Calise testified that the officers were in Carr's apartment for approximately thirty minutes.

The officers then went to apartment #206, where they were told the "building captain" lived.  There, they spoke with Marianna Couchon.  As "building captain," Couchon possessed keys to all units in the building.  Couchon told the officers that she was Timmann's aunt and confirmed that Timmann lived alone in apartment #205.  Couchon also told the officers that Timmann was not presently home and that she assumed he was at work, because she had seen his limousine in the parking lot the previous night, but it was not there now.  Officer Calise asked Couchon for Timmann's cell phone number, which she provided to him.  Officer Calise also told Couchon that the officers needed to enter apartment #205, and Couchon provided them with a key.

4

At 11:54 AM, Officer Calise placed a phone call to Timmann. Timmann did not answer. Officer Calise left Timmann a voice mail, instructing Timmann to call the Sunrise Police Department. At 12:45 PM, having received no call back, Officer Calise called Timmann's number a second time. Timmann did not answer, and Officer Calise did not leave a second voice mail.

After inspecting apartment #204, but before entering apartment #205, Officers Calise and Martin knocked on the door of apartment #205 and identified themselves as police officers. They received no answer. The record is unclear as to precisely when this occurred relative to the officers' conversation with Couchon and the phone calls to Timmann.

Officer Calise then contacted his shift supervisor, Sergeant Mark Hudson, and the decision was made that Officers Calise and Martin should enter Timmann's apartment. Shortly after 12:45 PM, the two officers entered apartment #205 using the key given to them by Couchon. They found no one in the kitchen and living areas of the apartment. They saw no signs of struggle, bullet holes, blood, or other evidence of injury. They yelled to announce that they were with the Sunrise Police Department and were entering, but received no response.

Approaching the back of the apartment, the officers saw a display case in the hall leading to the bedroom that contained military and hunting knives, as well as other military paraphernalia. The officers tried the bedroom door, and discovered

5

that it was locked.  They could see that a light was on inside the bedroom.  They knew from the layout of the two apartments that the bullet hole they had observed in apartment #204 must have passed through the wall of this bedroom.  The officers knocked on the bedroom door, but received no response.  They could hear no sounds of movement or other noises emanating from the bedroom.

Officers Calise and Martin then exited Timmann's apartment and called their supervising sergeant for back-up.  About ten minutes later, Officer McDonald arrived on the scene.  Officer McDonald attempted to pick the lock on Timmann's bedroom door, but was unsuccessful.  Sergeants Hailey and Hudson then arrived on the scene, followed by Lieutenant Dorn and Officer Williams.  Lieutenant Dorn gave the order to kick down Timmann's bedroom door, and either Officer Calise or Officer McDonald kicked the door down.  Officer Calise testified that this occurred less than thirty minutes after the officers' initial entry into apartment #205.

Once inside the bedroom, the officers found no one present and no signs of injury.  However, they found numerous firearms and ammunition, lying in plain view.  They also located a bullet hole in the wall abutting apartment #204.  Officer Martin took photographs of the scene in the bedroom.  The officers then exited Timmman's apartment and left the apartment building.

Back at the police station, Officer Calise began an officer safety report, a noncriminal procedure intended to alert future officers who might be called to

6

Timmann's apartment that Timmann might be armed. While completing this report, Officer Calise ran a criminal history check on Timmann and discovered two prior felony charges, one involving weapons. According to Officer Calise, it was then that a criminal investigation began against Timmann. Officers Calise and Martin returned to 9360 Sunrise Lakes Boulevard, where they met with Sunrise detectives.

Thereafter, the police spoke with Timmann by telephone three times. The first conversation occurred at 3:33 PM. Officer Calise called Timmann's cell phone. Timmann answered and told Officer Calise that his aunt, Couchon, had told him that the police "were at his apartment" and that this was "because of the bullet hole." Timmann explained that a friend had given him a rifle, and that Timmann had thought it was unloaded, but it had discharged accidentally while he was cleaning it. Officer Calise asked Timmann whether he knew if the shot had gone through the wall or hurt anyone. Timmann replied that he had meant to check with his neighbor, but never got around to it. Timmann ended the call by telling Officer Calise that he would return home in half an hour. At no point in this conversation did Officer Calise tell Timmann that officers had entered Timmann's apartment and found firearms and ammunition.

At 4:13 PM, Officer Calise called Timmann again to ask why he had not returned home. During this call, Officer Calise told Timmann that the police had

7

searched his apartment and that they knew about his criminal history.  Later in the call, Timmann admitted to owning the firearms found in the bedroom.

At 6:49 PM, Detective Luis Fernandez called Timmann's cell phone. Timmann had still not returned home.  During this call, Detective Fernandez told Timmann that the police had found guns in Timmann's bedroom.  Later in the call, Timmann admitted that the firearms were his.  Subsequently, officers obtained a search warrant and seized the firearms and ammunition found in Timmann's bedroom.

On April 21, 2011, Timmann was indicted on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  On May 23, 2011, he filed a motion to suppress the firearms and ammunition seized by police officers that were found during the warrantless search of his apartment, arguing that there was no probable cause and no exigent circumstances to justify the officers' warrantless entry.  On July 11, 2011, the District Court held a hearing on Timmann's motion to suppress, at which Timmann made an ore tenus motion to suppress his telephone statements to police.  After receiving testimony establishing the facts set out above, the court outlined how the case might progress depending on whether it granted or denied Timmann's motions.  If it granted Timmann's motions to suppress, the Government would likely appeal the rulings.  If it denied the motions, and Timmann attempted to enter a conditional guilty plea under Rule

11(a)(2)[1] and thus preserve his right to appeal the rulings, it would not accept the plea.[2] Anticipating that the court would not accept a conditional guilty plea, the prosecutor, with defense counsel's agreement, informed the court that it was the parties' intent that, with the court's approval, the case be tried to the bench and not to a jury, and that the parties would enter into a stipulation of facts sufficient to establish the defendant's guilt.

On September 9, 2011, the District Court denied Timmann's motions to suppress the physical evidence and statements. Shortly thereafter, the parties entered into a stipulation of facts—in which Timmann conceded that he admitted in phone calls that he possessed the fourteen guns and ammunition found in his bedroom—and informed the court that they were ready for a bench trial. On September 19, 2011, the court called the case, Timmann waived his right to a jury trial,[3] the Government consented to the waiver, the District Court approved it and then proceeded to try the case. The trial was brief. The evidence consisted of the

---

[1] Fed. R. Crim. P. 11(a)(2), "Conditional Plea," states:

> With the consent of the court and the government, a defendant may enter a conditional plea of guilty or no lo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

[2] The court stated that it never accepted conditional pleas under Rule 11(a)(2).

[3] Fed. R. Crim. P. 23, "Jury or Nonjury Trial," states: "(a) Jury Trial. If the defendant is entitled to a jury trial, the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves."

parties' stipulation that Timmann possessed the firearms and ammunition found in in the bedroom of his apartment, and a composite depicting those firearms and ammunition. The Government presented—and the court admitted—no further evidence, including, notably, the three phone calls. Based on the stipulation, the court found Timmann guilty as charged. On December 5, 2011, the court sentenced Timmann to a prison term of 48 months, entered judgment for the Government and informed Timmann of his right to appeal. He timely appealed the court's judgment on December 6, 2011.

## II.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). This court must accept the District Court's factual findings as true, unless those findings are clearly erroneous. Id. The District Court's application of the law to those facts is reviewed de novo. Id.

## III.

In denying Timmann's motion to suppress, the District Court held that the officers' initial warrantless entry into Timmann's apartment was justified under the emergency aid exception to the Fourth Amendment's warrant requirement because the officers had a reasonable belief that someone inside—Timmann himself or another person—might be injured or threated with injury, and in need of immediate

10

aid. The court held that the officers' subsequent warrantless entry into Timmann's bedroom was justified either as a protective sweep because the officers reasonably believed that there might have been a dangerous person inside, or under the same exigent circumstances that justified entry into the apartment. The court further held that, even if the police were not justified in making a warrantless entry into Timmann's apartment and bedroom, Timmann's statements to police during the 3:33 PM telephone conversation were admissible because they were not the product of being confronted with unlawfully obtained evidence. However, the court held that Timmann's admissions made during the 4:13 PM and 6:49 PM telephone calls were the product of being confronted with evidence seized from Timmann's apartment and therefore must be suppressed if that evidence was unlawfully obtained. The court noted that the Government had not opposed suppression of these two latter telephone conversations.

Timmann asserts that the District Court erred in denying his motion to suppress on three grounds: (1) the police officers' warrantless entry into his apartment was not justified under the emergency aid exception because the officers' belief that someone inside the apartment may have been in need of immediate aid was unreasonable; (2) the police officers' subsequent forced, warrantless entry into his locked bedroom was not justified either under the emergency aid exception or as a protective sweep; and (3) his statements to police

11

during the 3:33 PM phone call, placed after the officers' warrantless entry, were fruits of an illegal search. We address these arguments in turn.

A.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment's prohibition against unreasonable searches and seizures is enforceable against the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081 (1961). Central to the protections provided by the Fourth Amendment is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Kyllo v. United States, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041, 150 L. Ed. 2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S. Ct. 679, 683, 5 L. Ed. 2d 734 (1961)). Therefore, "searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559, 124 S. Ct. 1284, 1290, 157 L. Ed. 2d 1068 (2004)).

Nevertheless, there are several well-established exceptions to the warrant requirement. One such exception permits warrantless entry when "exigent circumstances" create a "compelling need for official action and [there is] no time

12

to secure a warrant." United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002) (quoting Michigan v. Tyler, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949, 56 L. Ed. 2d 486 (1978)). In such a case, "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290 (1978) (quoting McDonald v. United States, 335 U.S. 451, 456, 69 S. Ct. 191, 193, 93 L. Ed. 153 (1948)). The most urgent of these exigencies is "the need to protect or preserve life" in an emergency situation. Holloway, 290 F.3d at 1335. This is known as the "emergency aid" exception. Kentucky v. King, ___ U.S. ___, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011).

"Under the 'emergency aid' exception, . . . 'officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Id. (quoting Brigham City, 547 U.S. at 403, 126 S. Ct. at 1947). In order for the exception to apply, officers must have an objectively reasonable belief that someone inside is "seriously injured or threatened with such injury," and is in need of immediate aid.[4] Brigham City, 547

---

[4] In United States v. Holloway, this court held that for the emergency aid exception to apply, the "Government must demonstrate both exigency and probable cause," and that "in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." 290 F.3d 1331, 1337–38 (11th Cir. 2002). In Brigham City, the Supreme Court clarified that, for the exception to apply, the Fourth Amendment requires a showing that officers had an objectively reasonable belief that someone in the home is injured or threatened with injury—rejecting an approach centered on the officers' subjective motivation—without explicitly addressing whether this showing is to be made under the mantle of "probable cause."

13

U.S. at 403–04, 126 S. Ct. at 1947–48.  "The officer's subjective motivation is irrelevant."  Id. at 404, 126 S. Ct. at 1948.  The government bears the burden of demonstrating that the exception applies.  Holloway, 290 F.3d at 1337.

Courts have held police officers' belief that someone inside a home needs immediate assistance objectively reasonable under various circumstances.  However, these circumstances have in common the indicia of an urgent, ongoing emergency, in which officers have received emergency reports of an ongoing disturbance, arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior.  In Brigham City, for example, officers responded to a call regarding a loud party at a residence.  547 U.S. at 400–01, 126 S. Ct. at 1946.  When they arrived on the scene, the officers heard shouting inside and saw through a screen door and windows that a fight between four adults and a juvenile was taking place in the house.  Id. at 401, 126 S. Ct. at 1946.  The officers saw the juvenile punch one man in the jaw, causing him to spit blood.  Id.  While the other adults forcefully pushed the juvenile, the officers entered the house to

---

Brigham City, Utah v. Stuart, 547 U.S. 398, 403–05, 126 S. Ct. 1943, 1947–48, 164 L. Ed. 2d 650 (2006).  The Court affirmed this approach in Michigan v. Fisher, 558 U.S. 45, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009).  In Michigan, the Court held that the "'emergency aid exception' . . . requires only 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid . . . .'" (alteration in original) (internal citations omitted).  Id. at 47, 130 S. Ct. at 548.  Because this is essentially the same approach this court applied in Holloway— requiring a reasonable belief that a person is in danger coupled with an immediate need to act— we find that Brigham City did not alter our test for the emergency aid exception.  See Holloway, 290 F.3d 1337–38.

14

break up the fight.  Id.  The Supreme Court held that under "these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning," and so their warrantless entry was justified.  Id. at 406, 126 S. Ct. at 1949.

In Michigan v. Fisher, officers responded to a complaint of a disturbance at a residence.  558 U.S. 45, 45, 130 S. Ct. 546, 547, 175 L. Ed. 2d 410 (2009).  As they approached, a couple directed the officers toward a house where they said a man was "going crazy."  Id.  When they reached the house, the officers found a pickup truck in the driveway with its front end smashed, damaged fence posts along the property, and three broken house windows, with glass littering the ground outside.  Id. at 45–46, 130 S. Ct. at 547.  The officers noticed blood on the exterior of the pickup and the doors of the house.  Id. at 46, 130 S. Ct. at 547.  They also observed a man inside the house, screaming and throwing things.  Id.  The officers then entered the house.  Id.  The Supreme Court noted that, just as in Brigham City, the officers in Fisher "were responding to a report of a disturbance," they "encountered a tumultuous situation in the house" when they arrived on the scene, and they "could see violent behavior inside."  Id. at 48, 130 S. Ct. at 548–49.  The Court held that it was objectively reasonable for the officers to conclude that the man inside the house might be throwing things at "a human target" or that

15

he might "hurt himself in the course of his rage," and therefore the officers' entry was justified under the Fourth Amendment.  Id. at 48, 130 S. Ct. at 549.

We have held warrantless entry reasonable under similar circumstances.  In Holloway, officers responded to an emergency 911 call reporting gunshots and arguing overheard at a mobile home.  290 F.3d at 1332.  While on their way to the scene, the officers received a second dispatch indicating that the 911 caller had reported continuing gunshots and arguing.  Id.  When they arrived, the officers found a man and his wife on the porch of the mobile home.  Id.  While the officers were securing the couple and a neighbor who was present, a child appeared in the doorway of the mobile home and was ordered back inside.  Id. at 1332–33.  Finally, one of the officers approached the mobile home.  Id. at 1333.  There, he saw "beer cans strewn about the yard and porch," a shotgun shell lying on a picnic table, three more shotgun shells lying in the grass, and a shotgun with the safety disengaged lying against the side of the mobile home, three feet from where the couple had been standing.  Id.  The officer then entered the mobile home to "search for victims and investigate the disturbance."  Id.  We held that the two 911 calls indicated an ongoing emergency, which was confirmed by the observations of the officers when they arrived on the scene, and so the officers had "probable cause to believe a person located at the residence was in danger."  Id. at 1338.  Thus, we held the officer's warrantless entry justified under the Fourth Amendment because

16

the "possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating immediate search." Id.

Where the emergency aid exception is marshaled to justify warrantless entry in case of a possible suicide attempt, we have found a belief that the victim was in danger and in need of immediate aid reasonable under circumstances that similarly indicate an urgent, ongoing emergency. In Roberts v. Spielman, a sheriff's deputy "responded to a call about a possible suicide attempt" at Roberts' house. 643 F.3d 899, 902 (11th Cir. 2011). When he arrived at the house, he was met by Roberts's former sister-in-law, Huckabee, who told him that she had been trying to make contact with Roberts for an hour. Id. She also told the deputy that Roberts lived alone, "had a history of suicide attempts," and was "on medication for bipolar disorder." Id. Given Roberts's history, Huckabee was afraid that Roberts had committed suicide because Roberts's truck was parked in the driveway and two televisions were on inside her house, yet Roberts had not responded to Huckabee's attempts to contact her. Id.

After knocking and receiving no response, the deputy pushed open Roberts' back door enough to allow him to look inside, where he was met by an alive but angry Roberts. Id. After a brief argument, the deputy grabbed Roberts by her arm and removed her from her home for a short time, in order to determine that she was

17

not suicidal. Id. at 902–03. The deputy then left the scene. Id. at 903. We held

that the deputy's actions were justified under the Fourth Amendment because,

> "[g]iven Roberts's belligerent behavior when [the deputy] opened the
> door and identified himself, and in light of what Huckabee had told
> him, [the deputy] could reasonably have believed that Roberts posed a
> danger to herself that justified his remaining inside the doorway of her
> home for about five minutes and then, for safety reasons, briefly
> removing her from the home while he tried to calm her down and
> determine her mental state."

Id. at 906.

The situation the officers confronted in the instant case bears none of these

indicia of an urgent, ongoing emergency. The officers here did not receive an

emergency report regarding an ongoing disturbance, but rather a service call

regarding what appeared to be a bullet hole, which circumstances known to the

officers indicated had been made at least 39 hours prior to when the officers made

entry.[5] When Officer Martin first arrived at the apartment building, she did not

encounter a tumultuous scene, nor were the officers met with chaos when they

returned to the building the next day. The officers observed no violent behavior,

nor did they see or hear evidence that a fight had taken place or that anyone had

---

[5] The District Court held that, despite the length of time between when the bullet hole was made and when the officers entered Timmann's apartment, the emergency justifying entry had not dissipated. Setting aside the question of whether an emergency may or may not dissipate with the passage of time, this reasoning is inapposite. The relevant inquiry focuses on what an officer would reasonably believe upon encountering the purported emergency situation. In the absence of the officers' encountering an ongoing disturbance, or some other indication of injury or threatened injury, that would create a reasonable belief that immediate aid is required, there is no emergency capable of dissipation in the first place.

18

been injured, other than finding a single bullet hole.[6]  Nor did the officers have any information that would lead them to suspect that Timmann might be suicidal, or that he might be home (in fact, the absence of his work vehicle indicated that he was likely not at home).  Considering the totality of the circumstances, it was not reasonable for the officers to believe that someone inside Timmann's apartment was in danger and in need of immediate aid.  Therefore, we find that the District Court erred in holding that the emergency aid exception justified the officers' warrantless entry into Timmann's apartment.

B.

The District Court held that the officers' subsequent warrantless entry into Timmann's locked bedroom was justified either as a protective sweep of the premises—to search for individuals who might do them harm—or by the same exigent concern for potential victims that justified their initial entry into the apartment.  Neither rationale is persuasive.

---

[6] The District Court noted that bullet holes alone can indicate an emergency, even absent other evidence of injury.  While there may be situations in which this is so, the cases the court cites for this proposition are distinguishable from the instant case in that they present circumstances in which police officers responded to emergency calls reporting bullets recently fired.  See United States v. Huffman, 461 F.3d 777, 784 (6th Cir. 2006) ("[Officers'] assessment of the level of danger and the need for immediate action . . . was a result of the 911 call reporting shots fired as well as observations on the scene—particularly the shards of glass on the front porch—leading them to believe that the shots were recently fired."); People v. Francis, 584 N.Y.2d 919, 919, 184 A.D.2d 656, 656–57 (App. Div. 1992) (finding a search to be justified where police found a bullet hole in a landlord's ceiling after responding "immediately to a call for help" from the landlord).  In the instant case, these indications that the bullet hole represented an urgent, ongoing emergency situation are absent.

19

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094, 108 L. Ed. 2d 276 (1990). A protective sweep may also be undertaken without an arrest warrant, so long as the officers are lawfully within the premises due to, for example, the existence of exigent circumstances. United States v. Caraballo, 595 F.3d 1214, 1224–25 (11th Cir. 2010). In order to conduct a protective sweep, an officer must "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 337, 110 S. Ct. at 1099–100.

In order to perform a protective sweep that comports with the requirements of the Fourth Amendment, the officers must in the first place be lawfully within the premises. See Caraballo, 595 F.3d at 1224–25. Because the officers' initial warrantless entry into Timmann's apartment was unreasonable under the Fourth Amendment, the officers were not lawfully on the premises. Thus, the District Court erred in holding that the officers' subsequent forced entry into Timmann's locked bedroom was a lawful protective sweep.

Neither was the officers' entry into Timmann's bedroom justified under the emergency aid exception. Because the officers' initial entry into Timmann's apartment was not reasonable under the Fourth Amendment, the District Court

20

erred in holding that the same justification permitted the officers to enter Timmann's bedroom.

## C.

Finally, the District Court held that even if the officers' warrantless entry into Timmann's apartment was illegal under the Fourth Amendment, Timmann's statements to police during the 3:33 PM phone call need not be suppressed, although his statements made during 4:13 PM and 6:49 PM telephone calls were inadmissible.  We agree.

Under the so-called "fruit of the poisonous tree" doctrine, admissions or confessions that the police induce by confronting a suspect with evidence obtained through an illegal search or seizure must be suppressed.  See Fahy v. State of Conn., 375 U.S. 85, 91, 84 S. Ct. 229, 232, 11 L. Ed. 2d 171 (1963) (holding that "petitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence"); see also Amador-Gonzalez v. United States, 391 F.2d 308, 318 (5th Cir. 1968) (holding a "confession, resulting from [an unlawful] seizure and . . . subsequent narcotics arrest, was the 'fruit of the poisoned tree' and therefore inadmissible"), overruled on other grounds by United States v. Causey, 834 F.2d 1179 (5th Cir. 1987).

The government bears the burden of demonstrating that evidence "was not obtained as a direct result of the illegal search."  United States v. Crosby, 739 F.2d

21

1542, 1549 (11th Cir. 1984). "The relevant inquiry examines the extent of the causal connection between the lawless police conduct and the evidence in question; i.e., 'whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1982) (quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963)). This inquiry "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." Id.

The necessary causal connection is not, however, "established merely because 'but for' the illegal police conduct the defendant would not have responded as he did." Id. (citing Dunaway v. New York, 442 U.S. 200, 217, 99 S. Ct. 2248, 2259, 60 L. Ed. 2d 824 (1979)). "The government may defeat a motion to suppress by demonstrating a break in the causal chain." Id. (citing United States v. Fike, 449 F.2d 191, 193 (5th Cir. 1971)).

Three general exceptions to the fruit of the poisonous tree doctrine have been developed, under which the government may break that causal chain and defeat a motion to suppress. "First, intervening events or circumstances independent of the primary illegality may have so attenuated the causal connection as to dissipate the taint of the unlawful police action." Id. (citing United States v.

22

Ceccolini, 435 U.S. 268, 279–80, 98 S. Ct. 1054, 1061–62, 55 L. Ed. 2d 268 (1978); United States v. Berry, 670 F.2d 583, 604–05 (5th Cir. 1982)).  "Second, the government may use evidence that it has obtained in fact from a source independent of the primary illegality."  Id. (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920); United States v. Ible, 630 F.2d 389, 393–94 (5th Cir. 1980)).  "Third, evidence may be admissible if the government inevitably would have discovered it without the aid of the unlawful police conduct, pursuant to [this circuit's] limited version of the 'inevitable discovery' rule."[7]  Id. (citing United States v. Brookins, 614 F.2d 1037, 1042 n.2, 1044–49 (5th Cir. 1980); United States v. Wilson, 671 F.2d 1291, 1294 (11th Cir. 1982); Brewer v. Williams, 430 U.S. 387, 406 n.12, 97 S. Ct. 1232, 1243 n. 12, 51 L. Ed. 2d 424 (1977)).

Furthermore, we have recognized "several factors which are relevant to determining whether the defendant's behavior was a product of the illegal police

---

[7] In United States v. Brookins, 614 F.2d 1037, 1042 n.2 (5th Cir. 1980), the former Fifth Circuit noted that "[l]ike other circuits that have adopted the [inevitable discovery] rule, we do not require absolute inevitability of discovery but simply a reasonable probability that the evidence in question would have been discovered other than by the tainted source."  Unlike the precedents from other circuits, however, the ruling in Brookins was "based on two additional factors: first, that the prosecutor demonstrated that the leads, which made discovery inevitable, were possessed by the police and were being actively pursued by the police prior to the occurrence of the illegal police conduct; second, that the evidence in question was the voluntary testimony of a witness."  Id.

23

action." Id. at 1015. These "include the temporal proximity of the arrest and the defendant's response, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct." Id. (citing Dunaway, 442 U.S. at 218, 99 S. Ct. at 2259; Brown v. Illinois, 422 U.S. 590, 603–04, 95 S. Ct. 2254, 2261–62, 45 L. Ed. 2d 416 (1975)).

Here, when Officer Calise called Timmann at 3:33 PM, he did not "confront" Timmann with the evidence the officers obtained through their illegal search of Timmann's bedroom. During the call, Officer Calise did not tell Timmann that the officers had entered Timmann's apartment and found firearms and ammunition. Rather, Officer Calise only spoke to Timmann about the bullet hole in Carr's wall, information the officers learned about lawfully. Thus, because Officer Calise did not use the evidence obtained via the officers' unlawful search to induce Timmann's statement that a friend had lent him a rifle which he accidentally discharged, the statement was not made "as a direct result" of the unlawful search and thus not a fruit of that search. But cf. Ruiz v. Craven, 425 F.2d 235, 236 (9th Cir. 1970) (holding incriminating statements defendant made when police officers questioned him regarding heroin the officers found during an unlawful search of defendant's house were fruit of the poisonous tree); United States v. Nikrasch, 367 F.2d 740, 744 (7th Cir. 1966) (holding incriminating statements defendant made after a detective questioned defendant about serial

24

numbers the detective had obtained during an unlawful search of a stolen car were fruit of the poisonous tree).

Although the Government does not argue which of the three referenced exceptions breaks the causal chain in this instance, we find that "circumstances independent of the primary illegality" have attenuated the causal connection and thus "dissipate the taint" of the officer's unlawful search with regard to Timmann's statements during the 3:33 PM phone call.  See Bailey, 691 F.2d at 1013. Although only a short time had elapsed between the time of the unlawful search and Timmann's statements, it appears that Timmann made the statements because he had learned from his aunt—who called him on her own initiative—that the officers were at his apartment because of the bullet hole, and not because the officers confronted him directly with the evidence obtained during the unlawful search.  See Ceccolini, 435 U.S. 268, 279–80, 98 S. Ct. 1054, 1061–62 (holding a police officer's illegal search of an envelope at defendant's store and store clerk's testimony as to defendant's activities sufficiently attenuated to dissipate the connection between the two where a substantial period of time had elapsed between the two events and the clerk's testimony was an act of her own free will).

Timmann contends that in order to dissipate the taint of the officers' unlawful search, the Government must exclude the possibility that Timmann knew (from his conversation with his aunt) or reasonably assumed that his bedroom had

25

been searched, and that the United States failed to meet this burden because the only evidence it presented on this point was Officer Calise's testimony that he could not recall whether he had told the aunt that the officers had found firearms in Timmann's apartment, and did not know what any of the other officers might have told her. This argument fails to appreciate that the issue is not what Timmann knew prior to the 3:33 PM telephone call, but whether the officers exploited the fruits of their unlawful conduct in order to elicit Timmann's statements. Because the aunt's contacting Timmann represents an intervening circumstance that breaks the causal chain between the officers' unlawful search and Timmann's statements, it is irrelevant what the aunt knew prior to placing the call.

During the 4:13 PM and 6:49 PM telephone calls, on the other hand, the officers did confront Timmann with evidence they obtained through the unlawful search of his apartment and elicit thereby Timmann's admissions. During the 4:13 PM call, Officer Calise told Timmann that the police had searched his apartment. Timmann then admitted to owning the firearms found in the bedroom. During the 6:49 PM call, Detective Fernandez told Timmann that the police had found firearms in Timmann's bedroom. Timmann again admitted that the firearms were his. These admissions were the direct result of the officers' "exploitation" of the unlawful search, and must be suppressed as fruit of the poisonous tree. See Wong Sun, 371 U.S. at 488, 83 S. Ct. at 417.

26

Thus, we hold that the District Court erred in denying Timmann's <u>ore tenus</u> motion to suppress with regard to Timmann's statements during the 4:13 PM and 6:49 PM telephone calls, but did not err in denying Timmann's <u>ore tenus</u> motion to suppress with regard to Timmann's statements during the 3:33 PM telephone call.[8]

IV.

Accordingly, we VACATE the District Court's judgment, and REMAND the case for further proceedings not inconsistent with this opinion.

SO ORDERED.

---

[8] We note, however, that we need not engage in extensive analysis as to whether the District Court's proper denial of Timmann's motion to suppress with regard to his statements during the 3:33 PM telephone call renders the court's error in admitting the firearms and ammunition into evidence harmless. During the 3:33 PM call, Timmann stated that he had in his possession a borrowed rifle that accidentally discharged. As described above, although the court denied Timmann's motion to suppress the 3:33 PM call, the Government did not introduce the call into evidence. The only evidence presented at trial—other than a composite depicting the firearms and ammunition found in the bedroom of Timmann's apartment—was the parties' stipulation, in which Timmann admits to possessing the firearms found in his bedroom, but does not mention a borrowed rifle. Thus, despite the admissibility of Timmann's statements made during the 3:33 PM telephone call, because the calls were not before the District Court at trial, we cannot affirm Timmann's conviction on their basis.